

# FASULO, SHALLEY & DiMAGGIO L.L.P.
### ATTORNEYS AT LAW

LOUIS V. FASULO *
MARGARET M. SHALLEY
CHARLES DI MAGGIO
* ADMITTED NJ

OF COUNSEL
DOUGLAS KAHAN

March 5, 2009

*via ECF and FedEx*
UNITED STATES DISTRICT COURT, EDNY
Hon. Arthur D. Spatt, USDJ
200 Federal Plaza
Central Islip, NY 11722

       Re: ***United States v. Louis Fenza***
          03 CR 921 (ADS)

Dear Honorable Sir:

  As you know, our office represents defendant Louis Fenza, in the above-referenced matter. On March 20, 2008, Mr. Fenza was found guilty, at jury trial, to Counts One (1) through Five (5) of the indictment filed in the above-referenced matter. Count One charged Mr. Fenza with Racketeering; Count Two charged Mr. Fenza with RICO Conspiracy; Count Three charged Mr. Fenza with Extortion Conspiracy; Count Four charged Mr. Fenza with an Attempted Extortion on January 29, 1999 and Count Five charged Mr. Fenza with an Attempted Extortion on February 11, 1999. On May 9, 2008, Counsel filed a Motion for ReTrial based primarily on the insufficiency of evidence and the prejudicial effects of the "ballfield tapes," on Mr. Fenza. On August 7, 2008, the Court heard oral arguments regarding same and denied Mr. Fenza's motions. Counsel respectfully continues its exceptions to the Court's rulings on Mr. Fenza's Rule 29 and Rule 33 motions made to date.

  Sentencing is scheduled to take place at 1:30pm on March 27, 2009. This letter is respectfully submitted, pursuant to Rule 32 Fed. R. Crim. P., to advise this Court of several matters that the defendant will raise to aid in the determination of the appropriate sentence.

225 BROADWAY • SUITE 715 • NEW YORK, NY • 10007
NY (212) 566-6212 • FAX (212) 566-8165 • NJ (908) 273-5721
• FSDLAW@AOL.COM •

**PERSONAL BACKGROUND:**

Louis Fenza was born on June 10, 1951 to Anna and Albert Fenza in Brooklyn, New York. Mr. Fenza had a happy childhood in which he attended and graduated from Colby Academy. Mr. Fenza met his wife, Donna, while the two attended high school together. In 1973, he received a Bachelor of Arts degree from St. Francis College in Brooklyn.

On May 26, 1973, he and his wife Donna were married. She currently works as a payroll representative for Armor Corporation in Hicksville, NY. Mr. Fenza continues to run Park Place Limousines. A detailed account of the monthly revenue and liabilities for Park Place Limousines was provided to the Probation Department, and described in paragraph 76 of the PSR.

Mr. and Mrs. Fenza have four (4) children. Dena Chelius, age 32; Natalie Fenza, age 30; Albert Fenza, age 24; and Lucianne Fenza, age 22. Dena Chelius is married, operates a catering business and has three (3) children: Catarina, Christopher and Andrew. Natalie Fenza is an administrative clerk in Westbury, NY. Albert Fenza is a chef at a restaurant in Huntington, NY. Lucianne Fenza was matriculating at Syracuse University, but was forced to drop out because Mr. Fenza could no longer afford to send her as a result of the financial constraints of the instant litigation. Lucianne is now employed part-time.

Mr. and Mrs. Fenza have been living at their current address, 3 Madison Avenue, Jericho, NY for the past thirty (30) years. The house is currently on the market for sale, to help with the financial burdens presented by the instant matter. While the home was valued at greater than $800,000.00, there is a mortgage of approximately $400,000.00 used to satisfy tax liens and finance legal representation in this case. Of course, all of these financials will ultimately be determined by the actual selling price in our current National recession.

Mr. Fenza denies ever being diagnosed or seeking mental health treatment. He denies using illegal drugs and drinking alcohol. All were corroborated by family members and his urinalysis at Probation. However, in order to best understand who Louis Fenza is, as an individual, the Court must read the letters of support, provided by family and annexed hereto as Exhibit "A." Some of the more pointed excerpts are as follows:

Dena Chelius' letter mostly describes Mr. Fenza's ardent balance between work and family life:

> "My father worked constantly. However,...he was always with us. Limousine businesses are all day all night operations. They can be run from an office or from home....He came to all school events, soccer games, etc. He never missed anything. He was always there for us, but he always had a phone and ran his business wherever we were."

Ms. Chelius' letter goes on to describe the sacrifices Mr. Fenza made for her family when her husband's job disintegrated with the real estate market in recent years. Further, she speaks about his devotion to his wife Donna:

> "In recent years my mother has suffered from severe back problems. My father takes such good care of her it is amazing. He has assumed all the household duties that she cannot do. He does everything for her."

While Ms. Chelius also discusses the incredibly close relationship Mr. Fenza has with his grandchildren, as most of the letters do, she also makes the salient points of the continued close relationship between Elliot Hurdy and the Fenza family even after April 1, 1999, and the contradictory facts that such a protective father brought two (2) of his daughters to work in the Huntington Townhouse.

Daughter Natalie Fenza's letter provides a shining example of Mr. Fenza in an every-day situation:

> "I was in a car with my dad one day driving home and a young girl stopped us on the street. She was in the car alone crying because she was lost. She was on her way home from seeing her mom in the hospital and didn't know how to get back on the expressway so my dad not only gave her directions but he actually made her follow us so he could just show her the way so she wouldn't be nervous and get lost. My dad said to me is that 'I have three daughters and all I hope for is that some day if any of you are in that situation that someone will help you like I helped her.'"

Son-in-Law Garrett Chelius' letter described a businessman who gives hope by employing people who had no other luck, and describes how valuable and wide-reaching Mr. Fenza's employment is, as well as how catastrophic the folding of Park Place Limousines will be:

> "[Mr. Fenza] employs a Dispatcher who cares for and has essentially adopted his niece since she was abandoned by her substance abusing mother. One of his drivers is raising a mentally challenged child whose wife left several years ago. Louis even has a gentleman who is by all accounts unemployable due to mental conditions do [sic] all of his yard work and landscaping. I once asked him why he takes on reclamation projects and so many people who are down on their luck. He simply replied, 'When you give people a chance when nobody else does they appreciate the opportunity and do a good job for you.'"

Luanne Delfino, Mr. Fenza's sister-in-law, described the scenario where Louis reached out to Ms. Delfino's husband, working at Morgan Stanley on the horrible morning of September 11, 2001. Mr. Fenza instructed him to walk up the West-Side Highway, with co-workers, to the Park Place Limousines office and take the only car home. Despite the mania of that morning, Mr. Fenza ensured a family member and several strangers safely made it home, and never asked nor received payment for the use of his company's car.

Nancy Tesoriero, Mr. Fenza's sister, described being left by her husband with two (2) small children. Both her letter, and her son Philip Tesoriero's letter give a telling account of Mr. Fenza's devotion to helping raise his two (2) nephews in the absence of a father.

As stated earlier, a common theme throughout many of the letters is Mr. Fenza's role as a loving and devoted grandfather.

These excerpts highlight some of the numerous acts of charity, supportiveness and family values that Mr. Fenza has performed during his lifetime. We encourage the Court to read each of the letters attached to greater understand Mr. Fenza outside of the confines of this case. We further believe that by reading those letters, as well as considering Mr. Hurdy's testimony at trial and weighing all other evidence adduced at trial, that the Court will best be prepared to issue the most appropriate sentence.

Based upon our observations over the last two (2) years spent with Mr. Fenza, we have concluded that it is not an overstatement to say that Mr. Fenza is frustrated by the verdict and deeply fears the effect his possible incarceration will have on his family. Mr. Fenza also deeply fears the effect his possible incarceration will have on his business, Park Place Limousines, and its employees.

**THE PRE-SENTENCE REPORT**:

Louis Fenza will respectfully request that the Court adopt the following findings and conclusions of the PSR.

- That the base offense level is 18. (PSR¶ 38);
- That a two (2) level enhancement is warranted as a result of the use of implied threat of harm (PSR ¶ 39);
- There are no victim related adjustments. (PSR¶ 41);
- That his Criminal History Category is II (PSR¶¶ 54 and 62), before any additional departures.

**OBJECTIONS and CLARIFICATIONS TO THE PRE-SENTENCE REPORT:**

Objections and requests for clarification are made in numerical order, as follows:

1. Mr. Fenza respectfully objects to paragraphs 13 - 18 of the PSR, which describe the Colombo Organized Crime Family in detail. This information is neither relevant nor probative to Mr. Fenza's sentencing. Paragraph 19, which states Mr. Fenza as being an "associate" of the Colombo Organized Crime Family accurately and succinctly states the Jury's finding as to his involvement in the alleged enterprise. No further information is required. As a result, Mr. Fenza requests that paragraphs 13 - 18 of the PSR be redacted.

2. Mr. Fenza respectfully requests to clarify paragraph 20. The last sentence describes the fact that the Huntington Townhouse was not given a commission for its referrals to Park Place Limousines. Mr. Hurdy testified at trial that he never asked nor even brought up commissions to Mr. Fenza.

3. Mr. Fenza respectfully requests to clarify paragraph 21, at page 7, which discusses the 3rd-party limousine company debt at issue. It is important to note that Mr. Hurdy testified that the threats did not come from Mr. Fenza, and that he considered Mr. Fenza a help. Additionally, Mr. Hurdy testified that he sometimes made no payments at all against the debt.

Paragraph 21, at page 8, describes the February 11, 1999 attempted extortion. First, while Mr. Leto was surveiled entering and exiting the Huntington Townhouse, there was no exchange of money that was witnessed nor testified to. Further, Mr. Hurdy was unable to recall when he made any of the payments to Leto throughout the relationship.

4. Mr. Fenza respectfully objects to paragraphs 23, 24 and 27. Mr. Fenza was not charged in the Barr Industries extortion and consequently, these paragraphs must be redacted from the PSR.

5. Mr. Fenza respectfully objects to paragraph 28, in which Probation sited that no mitigating factors exist. Arguments regarding mitigating and other factors to be considered under 18 USC §3553(a) will be discussed below.

6. Mr. Fenza respectfully objects to paragraphs 30 through 33, which solely discuss Mr. Leto's alleged activity. As a result, these paragraphs must be redacted from the PSR.

7. Mr. Fenza respectfully requests to clarify paragraph 35. The second and third sentences describe a reduction for "acceptance of responsibility" as a result of a plea. Obviously, Mr. Fenza did not plea in this matter and as a result, the second and third paragraphs must be redacted or amended.

8. Mr. Fenza respectfully objects to the use of the $25,000 "demand" in calculating the strict "guidelines sentence," as contained in paragraph 40. First, the Government did not provide any proof as to the identity of the individual or limousine company who made the alleged demand. This is particularly important given the length of time and considerable opportunity the FBI had to fully and properly investigate this crucial aspect of the case. Second, it must be noted that the "victim," the Huntington Townhouse, refused to pay the sum owed. It was only after a considerable time without payment, that the demand allegedly took place and Mr. Hurdy made occasional partial payments.

9. Mr. Fenza respectfully objects to paragraphs 55 through 59, which describe allegations and circumstances of Mr. Fenza's prior conviction. Paragraph 59 clearly states that the author has not received the defendant's case file from Archives. The accuracy of these statements is poor - at best. In light of the factual discrepancies and the fact that the authoring Officer did not have Mr. Fenza's prior case file at the time of drafting this PSR, it is respectfully requested that paragraphs 55 through 59 be redacted.

10. Mr. Fenza respectfully requests to clarify paragraph 64. The correct spelling of his sister's name is "Tesoriero," rather than "Tesiero" as written.

11. Mr. Fenza respectfully requests to clarify paragraph 69. The correct spelling of his eldest daughter's name is Dena "Chelius" rather than "Chilas" as written.

12. Mr. Fenza respectfully requests to clarify paragraph 71. He was taken off electronic monitoring and strict home confinement by Order dated December 6, 2007, until trial, rather than "December 6, 2008" as written.

13. Mr. Fenza respectfully requests to clarify paragraph 76. In regards to monthly earnings of Park Place Limousines, the report states "around $33,000 per month in profits...." It should read "around $33,000 per month in **revenue**."

## REQUEST FOR CONSIDERATION OF FACTORS UNDER 18 U.S.C. §3553(a):

Counsel respectfully requests that the Court consider the following factors in determining sentence, rather than the sentencing guidelines, pursuant to *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (US 2005) and *United States v Crosby*, 397 F3d 103 (2d Cir.2005). On behalf of Mr. Fenza, we humbly request that the Court sentence him to an additional period of home confinement, with a period of probation to follow. In the alternative, Counsel requests that the Court issue the minimal sentence it feels appropriate.

The trial and sentencing judge "is in a superior position to find facts and judge their import under §3553(a) in each particular case." *Gall v United States*, 552 US —, 128 S.Ct. 586, 597, 169 L.E.2d 445 (2007). In *Gall*, the Court cited the District Court Judge's reason for imposing a sentence of probation, including his belief as to how restrictive and consequential probation is. At one point, the District Court Judge said that Probation, "rather than an act of 'leniency,' is a 'substantial restriction of freedom.' *Gall v United States*, 128 S.Ct. at 593.

"[A] district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the 'heartland'' to which the Commission intends individual guidelines to apply." *Kimbrough v United States*, 552 US —, 128 S.Ct. 558, 563, 169 L.E.2d. 481 (2007), citing *Rita v United States*, 551 US —, 127 S.Ct. 2456, 2465, 168 L.E.2d 203 (2007)

Counsel makes the above-request in light of Mr.Fenza's lengthy and stringent pre and post-trial release, juxtaposed with the innocuous trial testimony of Elliot Hurdy, as well as Mr. Fenza's demonstrated rehabilitation since his release from prison in 1989. With respect to the factors listed below, Counsel believes, in good faith, that a sentence of an additional period of home confinement with a period of probation satisfies the goals of justice and the objectives of 18 USC §3553(a); and that such a sentence is "sufficient, but not greater than necessary."

### A. Mr. Fenza's Pre-trial Release Conditions.

Mr. Fenza was incarcerated for a period of six (6) days, representing the time from the date of his arrest on August 14, 2003 through the date of his satisfaction of pre-trial release conditions imposed by this Court, on August 20, 2003. Mr. Fenza was granted pre-trial release, bonded by $1,500,000.00 in property. Additionally he was restricted to home confinement with electronic monitoring from August 20, 2003 to December 6, 2007. From December 6, 2007 through trial, Mr. Fenza was under conventional monitoring. He was again placed on strict home confinement with electronic monitoring following the verdict on March 20, 2008. To date, he has endured more than sixty two (62) months of stringent home confinement without incident. Since August 20, 2003, Mr. Fenza has also had to report weekly to Pre-Trial Services. **Mr. Fenza has been subject to such strict conditions for a period greater than five (5) years and has always been fully compliant.**

If the Court were to consider the sentencing Judge's opinion in *Gall*, Mr. Fenza has already endured more than five (5) years of conditions harsher than those which accompany a period of Probation for a duration of time equal to the statutory maximum. Additionally, Mr. Fenza and his family have endured the inordinate emotions and stress of waiting for the unknowns presented at trial.

The Court must consider the fact that Mr. Fenza endured such a lengthy period of strict conditions due to the normal stages of a categorized "complex" matter; as well as the death of Defendant LETO's Counsel and delays caused by the acclimation of Ms. Seltzer; and the death of Mr. Fenza's original Counsel and delays caused by the acclimation of the undersigned. Indeed, this case is outside the "heartland" of traditional cases not only because of the nature of trial testimony, but also the lengthy period between arrest and trial.

*Counsel does not raise issue with the decision of the Court to impose such conditions.* Mr. Fenza clearly consented to and cooperatively arranged for these conditions to be met. The Court reasonably acted by imposing such severe pre-trial release conditions based upon the Government's representations in 2003 as to Mr. Fenza's danger to the community and his involvement with the crimes and activities charged in the indictment. However, Counsel raises such issues as the release conditions being unduly burdensome, in light of the gross disparity between the Government's representations in 2003 and the remarkably amicable trial testimony provided by Elliot Hurdy.

### B. Proof at Trial.

Counsel defers to the Court's recollection of the evidence and testimony adduced at trial. Additionally, as Counsel has raised numerous arguments in its Motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure regarding the nature and weight of the evidence, Counsel will keep its comments herein brief.

Elliot Hurdy repeatedly stated before the jury that he never feared or was intimidated by Mr. Fenza. It should be noted that no officer or other member of the Huntington Townhouse participated or cooperated in the Government's investigation nor the instant trial. Mr. Hurdy testified that he considered Mr. Fenza a friend, and to be of help around the Huntington Townhouse. Mr. Hurdy also stated that while he was intimidated by Defendant LETO, he did not consider Mr. Fenza to be

extorting him or the Townhouse. As the Court has commented, "It is unusual to hear the main witness for the prosecution say that the defendant is a nice guy. He likes him. And he doesn't think he was extorting him. That is unusual." (Trial Trx. 2471)

> (Trial Trx. 1031, line 14 - 1033, line 14; *Elliot Hurdy*)
> Q. But a cocaine house where they were doing cocaine, right?
> -----
> Q. And you were missing?
> A. For a couple of days.
> Q. As far as you knew, in some ways someone got in touch with Louis?
> A. I did.
> Q. You asked him to come and help you out?
> A. I asked him to get me out of there.
> Q. And he came?
> A. 100 percent.
> Q. And when he came, he just got you out, he didn't threaten anybody?
> A. No. He just pulled me out of there.
> Q. He told you that you should straighten up?
> A. He told me whatever problems I have, I'm too old for that stuff.
> Q. When was that in relation to the time that you bought the Townhouse?
> A. Could have been '98 sometime.
> Q. And after he dropped you off did he say, you know, I spent a lot of time today, can you give me some money for the work I've done to help you out today?
> A. No.
> **Q. He did it because he was your friend?**
> **A. Right.**
> Q. He didn't try to extort any money from you, did he?
> A. No.
> Q. He didn't even ask you for the gas money to go to a dangerous area and pull you out?
> A. No.
> Q. And you appreciated him for that, don't you.
> A. I really did.
> Q. To this day you still appreciate him for that?
> A. 100 percent I do.
> **Q. When you said you're here under subpoena, that's because you don't want to be here to testify against him because you don't feel he did anything wrong; isn't that right?**
> **A. Let's say I'm here under subpoena. I didn't want to testify against Louis, right.**
> Q. Do you think he took advantage of you when he came to the crack den and pulled you out of the crack den?
> A. No.
> **Q. Do you think he took advantage of you when he helped you to resolve the issues at the Townhouse?**
> **A. No.**

The evidence and testimony adduced against Mr. Fenza at trial do not comprise the ambit of such proof that one ordinarily associates with an extortion case. As such, the evidence and testimony are not within the "heartland" of circumstances that the United States Sentencing Commission could have foreseen or considered in structuring the guidelines for extortionate activity.

It must also be noted that Defendant LETO was sentenced to a period without incarceration for his activities and role in the alleged offense. By the testimony of Mr. Hurdy, Defendant LETO was more, if not solely culpable for the alleged activity.

As a result of the foregoing, it is respectfully requested that the Court issue a "non-guidelines" sentence, and that the Court further sentence Mr. Fenza to an additional period of home confinement.

### C. Mr. Fenza's Rehabilitation Since his Release from Prison in 1989.

In addition to Mr. Fenza's strict pre-trial release conditions, he also asks this Court to impose a sentence under the factors and considerations of 18 USC §3553(a) based upon his demonstrated rehabilitation since release from prison in 1989.

Shortly after being released, the United States Probation Department approved Mr. Fenza's employment as a Sales Manager for "Limousines by Lloyd." Two (2) short years later, on or about February 5, 1991, Mr. Fenza's Probation Officer approved his buying-out the owner of the company, then known as "Limousines by L, Ltd." Mr. Fenza's father, Albert, was the President, Mr. Fenza was the Vice-President and his wife, Donna, was the Secretary and Treasurer. Mr. Fenza ran the company on a day-to-day basis.

On or about April 12, 1993, the company was renamed and refiled as "Park Place Limousines, Inc." Albert Fenza was still the President, and Donna Fenza became the Vice-President, as well as continuing her Secretarial and Treasury roles. Louis Fenza continued to run the business on a day-to-day basis but resigned as a corporate officer. At this time, all of the company's car leases terminated. New cars had to be leased for the fleet, yet Mr. Fenza had several tax liens as a result of his earlier case. While all of those liens have since been satisfied, at the time Mr. Fenza's official role precluded the company from being able to afford a new fleet of cars. On March 29, 1995, Albert Fenza passed away. Donna Fenza assumed the corporate offices while Mr. Fenza continued to run and expand the business.

Prior to September 11, 2001, the business had grown to several cars and twenty-five (25) employees. Unfortunately the destruction of the September 11 terrorist attacks caused Park Place Limousines, like most other car companies, to lose all of their "downtown contracts," resulting in a loss of almost 75% of its business. After Mr. Fenza's arrest in 2003, Park Place Limousines lost its Manhattan dispatch site and garage space due to Mr. Fenza's restricted flexibilities.

Currently, Park Place Limousines employs four (4) drivers and two (2) dispatchers. Three (3) separate companies depend on Park Place Limousines for "farm-out" work on a daily basis. Park Place Limousines has several major corporate accounts and several travel companies with accounts that depend upon Mr. Fenza and the company. The company also has a small but strong list of

individual executive clients.

Over the past twenty (20) years Mr. Fenza has built and re-built a small but successful limousine and car-service company. Since his arrest in 2003, Mr. Fenza has maintained his devotion to the company despite the strict home confinement and stress of this case.

Rather than succumb to the stigmas of having been released from prison, or being dissuaded by the restrictions of supervised release or probation, Mr. Fenza took the opportunity to work hard and develop a business.

### (1) The Effect upon Park Place Limousines.

Park Place Limousines, like all limousines and car-services, is a 24/7 business. Running the operations means spending most of the day on a phone, juggling drivers, farm-outs, cancellations and reservation changes, and sometimes driving customers personally. While some may be able to perform some aspects of the job, Mr. Fenza is irreplaceable. By sentencing Mr. Fenza to an additional period of home confinement, he will be able to continue to run the business. If Mr. Fenza faces an extended period of incarceration, the business will likely lose income or even completely fail. Not only will Mr. Fenza's family lose the much-needed income from the business, the employees of Park Place Limousines may likely lose their employment in this deeply recessed economy.

In light of the foregoing, it is respectfully requested that the Court issue a "non-guidelines" sentence, and that the Court further sentence Mr. Fenza to an additional period of home confinement.

**CONCLUSION:**

Mr. Fenza respectfully requests that the Court impose an additional period of home confinement in satisfaction of any sentence, which will satisfy the goals and objectives of 18 USC §3553(a). In the alternative, Counsel respectfully requests that the Court imposed the most minimal sentence it feels appropriate given the special circumstances of the proof at trial, the extensive pre-trial release conditions and Mr. Fenza's personal qualities. Moreover, in consideration of his financial condition, it is respectfully requested that the Court Order that Mr. Fenza not be required to pay any fine. Defendant Louis Fenza, respectfully reserves the right to raise additional issues at the time of sentencing.

Respectfully yours,

Louis V. Fasulo
Aaron M. Goldsmith

cc: AUSA Allen L. Bode
AUSA Nicole C. Boeckmann
*via ECF and FedEx*

USPO Lisa N. Famularo
*via FedEx*